851 F.Supp. 1250 (1994)
Loretta J. HASTY, Plaintiff,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, Defendant.
No. 1:94-CV-96.
United States District Court, N.D. Indiana, Fort Wayne Division.
May 16, 1994.
*1251 John B. Powell, Stephen J. Williams, Shambaugh Kost Beck and Williams, Fort Wayne, IN, Robert E. Hoskins, Foster and Foster, Greenville, SC, for plaintiff.
Stephen J. Lerch, Fort Wayne, IN, Thomas C. Nyhan, James D. O'Connell, William J. Nellis, Rosemont, IL, Steven D. Davidson, Baird Holm McEachen Pedersen Hamann and Strafheim, Omaha, NE, for defendant.

ORDER
WILLIAM C. LEE, District Judge.
This matter is before the court on the parties' Cross Motions for Summary Judgment. For the following reasons, plaintiff's Motion for Summary Judgment is denied, and defendant's Motion for Summary Judgment is granted.

SUMMARY JUDGMENT
Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252, 106 S.Ct. at 2512; In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir.1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir.1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir.1992) (quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).
Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the *1252 absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir.1988); Guenin v. Sendra Corp., 700 F.Supp. 973, 974 (N.D.Ind.1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir.1983).
Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Id. 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252, 106 S.Ct. at 2512.

BACKGROUND
Plaintiff, Loretta J. Hasty, is a fifty-eight (58) year-old married female who was diagnosed in November 1993 as having stage II/III breast cancer and underwent a radical mastectomy for her disease. Because of the nature of her disease, plaintiff's treating physician, Dr. Joseph Gibbons of Fort Wayne, Indiana, recommended to Mrs. Hasty that she receive high-dose chemotherapy with peripheral stem cell rescue (HDC/PSCR).
HDC/PSCR is a procedure made up of five (5) phases. The first phase consists of the administration of standard chemotherapeutic agents in standard doses and is known as the induction phase. The second phase, known as the mobilization phase, consists of the administration of standard chemotherapeutic agents in standard doses along with other agents known as growth factors. The third phase of the treatment deals with the removal of white blood cells known as peripheral cells by a procedure known as leukapheresis. During the third phase, plaintiff would have blood removed and her white blood cells separated form the other components of her blood. The white cells are then frozen and stored.
The fourth phase consists of the administration of standard chemotherapeutic agents in high doses. As a part of the fourth phase and subsequent to the administration of the HDC, plaintiff's white blood cells previously extracted would be reinfused. The white blood cells are reinfused because the HDC, in addition to killing the cancer, indiscriminately kill healthy, white blood cells, and white blood cells are necessary for the reconstitution of the body's immune system which consists of white blood cells. The fifth phase consists of hospitalization of the patient to ensure the best recovery as possible from the treatment.
The proposed treatment is expensive and will cost between $80,000.00 and $150,000.00. Mrs. Hasty does not have the means necessary to pay for the procedure herself, and the medical provider of the treatment, Response Technologies, Inc. (R.T. Inc.), a for-profit corporation headquartered in Memphis, Tennessee, requires that Mrs. Hasty secure a pre-treatment coverage commitment from her health insurance carrier before it will begin administering the proposed treatment.
*1253 Mrs. Hasty sought such a pre-treatment coverage commitment from her health insurance carrier, the defendant, Central States, Southeast and Southwest Areas Health and Welfare Fund (hereinafter: "Central States"). Mr. Hasty is a member of the Teamsters Union and maintains health insurance with defendant through the Union. Mrs. Hasty is a beneficiary under the health insurance plan with Central States.
Central States is a not-for-profit trust fund constituting an "employee welfare benefit plan" as defined by the Employee Retirement Income Security Act of 1974 (hereinafter: "ERISA"). All of the Fund's income and assets are used to either pay medical claims covered by its Plan Document or to defray reasonable administrative expenses.
Central States is also a Taft-Hartley Trust governed by an eight member Board of Trustees. Four of the Trustees represent the International Brotherhood of Teamsters and the other four represent the management of businesses in the trucking industry. The Trustees administer the Trust in accordance with the Trust Agreement. The Trust Agreement authorizes the Trustees to make rules and regulations necessary to administer the Trust Agreement, to establish plans to provide benefits to teamster members and their families, to be the final authority in disputes about benefits, and to interpret conclusively the terms of the Trust Agreement and the plans.
Pursuant to the authority granted to them by the Trust Agreement, the Trustees established the C-6 Health Benefit Plan which is set forth in a lengthy, technical Plan Document. The Trustees caused to be distributed a Summary Plan Description (SPD) to participants which is a non-technical, "plain-English" description of the Plan Document. An SPD outlining the C-6 Health Benefit Plan's benefits, exclusions and other information must be distributed to participants and beneficiaries of the C-6 Health Benefit Plan pursuant to ERISA, 29 U.S.C. § 1022 and § 1024.
On February 15, 1994, R.T. Inc. requested Central States to certify that it would pay for the proposed treatment. On March 9, 1994, after consulting three physicians, Central States declined to certify that the treatment was covered under the terms of the C-6 Health Benefit Plan. On March 17, 1994, Mrs. Hasty appealed this preliminary determination. Central States requested Mrs. Hasty's medical records and other materials, and offered to expedite the appeal process by bypassing the lower levels of review and presenting her appeal directly to the Board of Trustees, which represents the highest level of review within Central States.
On April 1, 1994, Mrs. Hasty filed a Complaint and a Motion for Preliminary Injunction with this court seeking an order requiring Central States to pay for the HDC/PSCR treatment. On April 14, 1994, Central States transmitted Mrs. Hasty's medical records to the Pittsburgh Cancer Institute and requested Dr. Herberman, its Director, to evaluate Mrs. Hasty's case and the proposed treatment. Additional information was sent Dr. Herberman regarding Mrs. Hasty's case as they were received from Mrs. Hasty. On April 19, 1994, Dr. Herberman issued his written report to Central States which concluded:
The information currently available does not permit reliable conclusions regarding the ultimate relative-effectiveness or ineffectiveness of HDC-AR for breast cancer as compared to standard therapies. HDC-AR for breast cancer, including the specific procedure proposed for Ms. Hasty, is not uniformly and professionally endorsed by the general medical community as standard medical care.
On April 20, 1994, the Trustees met to consider Mrs. Hasty's appeal. At that meeting, the Trustees were provided with a sixty-six (66) page agenda with more than nine-hundred (900) pages of documents. Included in the material which the Trustees reviewed in consideration of Mrs. Hasty's appeal were her own medical records, the affidavit of Mrs. Hasty's treating physician, Dr. Joseph Gibbons, the affidavits of Dr. William West, Dr. Lee Schwartzberg, both associated with R.T. Inc., the affidavit of Dr. Mark O'Rouke and Dr. Gerald King, both associated with Hematology & Oncology Associates of Greenville, South Carolina, seven (7) peer review articles regarding the proposed treatment and its acceptance in the medical community, *1254 prior litigation outcomes, the protocol under which the treatment was to be administered and the written report of Dr. Herberman. All in all, the Trustees were presented with a very comprehensive agenda representing information advocating both for and against a finding that the treatment was covered under the Health Benefit Plan.
The Trustees unanimously determined that HDC/PSCR was not covered by the C-6 Health Benefit Plan for the treatment of breast cancer stating the treatment is "not uniformly and professionally endorsed by the general medical community as standard medical care ... [and] treatment (Active Plan Document, § 4.02)." The Trustees denied coverage for the proposed treatment based upon the exclusion language found in the Plan Document.
The treatment or services listed below are not covered by this Plan. You will not receive payment for the following:
Charges for care, treatment, services and supplies which are not uniformly and professionally endorsed by the general medical community as standard medical care, including care, treatment, services, and supplies which are experimental in nature.

DISCUSSION

Standard of Review
The court begins its analysis with a determination of the correct standard of review which it is to employ in reviewing the Trustees' decision that the proposed treatment is not covered under the Health Benefits Plan. Both plaintiff and defendant have discussed at great length what the proper standard of review is as this determination greatly affects the court's role in this case.
In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989), the Supreme Court of the United States held:
[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(-1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.
The Court reasoned according to well-established principles of trust law that where Trustees are given discretionary authority to interpret disputed or doubtful terms, the Trustees' interpretation will not be disturbed by the court if the interpretation is reasonable. Id. at 111, 109 S.Ct. at 954. "Hence, over a century ago we remarked that `[w]here trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the exercise of a discretion vested in them by the instrument under which they act.'" Id. (citing Nichols v. Eaton, 91 U.S. 716, 724-25, 23 L.Ed. 254 (1875) (emphasis provided)). Thus, the court must determine whether the Trustees have been given discretionary authority to interpret the C-6 Health Benefits Plan, and if so, what the proper standard of review other than a de novo standard is.
The court is not without guidance on this particular issue. The Seventh Circuit Court of Appeals has had an opportunity to determine whether the Trustees are empowered with discretionary authority to interpret the C-6 Health Benefits Plan now at issue before this court. Exbom v. Central States Health and Welfare Fund, 900 F.2d 1138 (7th Cir. 1990). In Exbom, the court held that the Trust Agreement conferred discretionary authority upon the Trustees to interpret the C-6 Health Benefits Plan. Id. at 1141. This court finds Exbom to be controlling on this issue, and therefore, follows its lead. The court notes that Exbom was decided on April 27, 1990, and is therefore puzzled as to why plaintiff failed to bring this controlling authority to the court's attention in her Motion for Summary Judgment.
Plaintiff sets forth various arguments that the Board of Trustees does not have discretionary authority to interpret the terms of the C-6 Health Benefits Plan. Plaintiff argues that she was not put on notice that the Board of Trustees had the authority to interpret the provisions of the C-6 Health Benefits Plan. She contends that the SPD, the only document which she has been provided by defendant, contains no language that would lead her to believe that the Board of *1255 Trustees has interpretive authority over the C-6 Health Benefits Plan, and for Central States to now assert that such discretionary authority exists in the Board of Trustees is unenforceable.
This argument must fail. At Chapter 10, entitled, "Plan Administration," the SPD clearly states that the Board of Trustees has such discretionary power. The SPD states:
The Fund's Board of Trustees is the only group having the authority to change or interpret any part of this Plan. No agent or Local Union representative acting alone has this authority. If the Trustees do change or interpret any major parts of the Plan, you will be informed of the changes. Plan administration is conducted by the Fund's employees, who are hired by the Trustees and answer to them.
Thus, in the document provided to plaintiff, there was language which provided her notice that the Board of Trustees had the authority to interpret the provisions of the Health Benefits Plan.
As a corollary to the above argument, plaintiff also states that Central States may not rely upon the Trust Agreement or the Plan Document to assert that the Board of Trustees has discretionary power where she has not been provided any notice of such authority in the SPD. However, the Seventh Circuit Court of Appeals has already determined that the Trust Agreement confers discretionary authority to the Board of Trustees to interpret the C-6 Health Benefit Plan. Exbom, 900 F.2d at 1141. Clearly, Central States is not limited to the terms of the SPD to assert that the Board of Trustees has such discretionary authority. Indeed, it is the Trust Agreement which controls the duties and activities of the Board of Trustees. It is the Trust Agreement which provides the ultimate source of authority for the Board of Trustees to interpret the Trust Agreement and the other ERISA Plan Documents formed by the Trustees pursuant to the terms of the Trust Agreement.
Plaintiff also cites case law for the proposition that where the SPD and the technical Plan Document conflict, the SPD is the controlling document. However, plaintiff fails to appreciate that there is no conflict between the SPD and the Plan Document or the Trust Agreement on the issue of whether the Board of Trustees has discretionary authority. As noted supra, the SPD states that the Board of Trustees has the authority to interpret the terms of the C-6 Health Benefit Plan. The Plan Document and the Trust Agreement likewise vest the Board of Trustees with such discretionary authority.[1]
Finally, plaintiff argues that amendments to the Trust Agreement and the Plan Document that more specifically set forth the Trustees' discretionary authority and were adopted on March 23, 1989, by the Board of Trustees are ineffective because she was not given proper notification of the changes pursuant to 29 U.S.C. § 1022 and § 1024. Therefore, she concludes, the Board of Trustees should not be entitled to assert that they *1256 have discretionary authority over the terms of the C-6 Health Benefits Plan.
Section 1022 states in pertinent part "[a] summary of any material modification in the terms of the plan ... shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title." 29 U.S.C. § 1022(a)(1). Section 1024 states in pertinent part "[i]f there is a modification or change described in section 1022(a)(1) of this title, a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan." 29 U.S.C. § 1024(b)(1).
Plaintiff's argument concerning the effectiveness of the amendments to the Trust Agreement and the C-6 Health Benefit Plan is without merit. First, the Seventh Circuit Court of Appeals has already decided that the Trustees have discretionary authority to interpret the terms of the Plan Document. Exbom, supra. The Seventh Circuit reached this decision under the terms of the Trust Agreement and the Plan Document as they existed before the amendments of March 23, 1989 were made. The amendments were made after the Supreme Court decided Firestone, supra, with the explicit goal of clarifying the discretionary authority already possessed by the Board of Trustees. Thus, the 1989 amendments to the Trust Agreement and the Plan Document would still not alter this court's conclusion that the Board of Trustees has discretionary authority over the terms of the Trust Agreement and the Plan Document.
Moreover, the changes to the Trust Agreement and the Plan Document do not represent material modifications that would warrant providing all of the participants and beneficiaries of the C-6 Health Benefits Plan with notice of the changes worked by the 1989 amendments. See, 29 U.S.C. § 1022(a)(1). The 1989 amendments simply clarify a power which the Seventh Circuit has already determined the Board of Trustees to possess. They do not materially change the Plan Document. Furthermore, as the court has discussed supra, plaintiff was already put on notice that the Board of Trustees has discretionary authority by the language found at Chapter 10 in the SPD.
Finally, the court holds that the amendments are valid as they apply to plaintiff even though she did not receive personal notice of the amendments. Godwin v. Sun Life Assurance Co. of Canada, 980 F.2d 323 (5th Cir.1992); Blau v. Del Monte Corp., 748 F.2d 1348, 1352 (9th Cir.), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); Govoni v. Bricklayers, Masons and Plasterers Int'l Local No. 5 Pension Fund, 732 F.2d 250, 252 (1st Cir.1984). The amendments are valid as plaintiff has failed to present any evidence to the court that there was active concealment of the amendments, or that there is "`some significant reliance upon, or possible prejudice flowing from' the lack of notice." Godwin, 980 F.2d at 328 (quoting, Govoni 732 F.2d at 252.
Plaintiff also asserts that defendant is operating under a conflict of interest. Plaintiff asserts that defendant is both the administrator and the insurer of the C-6 Health Benefit Plan and that this represents a conflict of interest that has influenced its decision to deny coverage of the proposed treatment. Accordingly, plaintiff argues that this court should give less deference to the decision of the Board of Trustees.
In Firestone, the Supreme Court held "[o]f course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a `facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). Thus, if this court finds Central States to be operating under a conflict of interest in utilizing its discretionary authority, the court must factor that finding into its analysis of what standard of review it is to apply.
However, the court does not find Central States, or more specifically, the Board of Trustees, to be operating under any conflict of interest. Plaintiff represents Doe v. Group Hospitalization & Medical Services, 3 F.3d 80 (4th Cir.1993), to be a case analogous to the instant case. However, upon close *1257 examination, the court finds Doe distinguishable from the case at bar.
In Doe, the administrator and the insurer of the health benefits plan, Blue Cross and Blue Shield of the National Capital Area (Blue Cross) a for-profit corporation, was one in the same. Furthermore, Blue Cross had discretionary authority over the health benefits plan, and therefore, could decide whether to deny or grant benefits under the health benefits plan. The Fourth Circuit Court of Appeals determined that the administrator, Blue Cross, was operating the health benefits plan under a conflict of interest:
In this case, Blue Cross insured the plan in exchange for the payment of a fixed premium, presumably based on the actuarial data. Undoubtedly, its profit from the insurance contract depends on whether the claims allowed exceed the assumed risks. To the extent that Blue Cross has discretion to avoid paying claims, it thereby promotes the potential for its own profit. That type of conflict flows inherently from the nature of the relationship entered into by the parties and is common where employers contact with insurance companies to provide and administer health care benefits to employees through group insurance contracts.
Doe, 3 F.3d at 86.
The court noted that every time Blue Cross approved a claim for benefits it was taking money out of its own pocket. Id. Thus, its fiduciary role as decisionmaker was in constant conflict with its profit-making role as a for-profit business. Id.
However, in the case at bar, the administrator and the insurer of the C-6 Health Benefits Plan is not one in the same as plaintiff alleges. The administrator of the C-6 Health Benefits Plan is the Board of Trustees and the insurer is the Trust itself. The Board of Trustees has no incentive to deny benefits to participants or beneficiaries. Indeed, the denial of benefits to any one participant or beneficiary does not produce any profit; it simply leaves funds available in the Trust for payment of other claims. Defendant is a not-for-profit Taft-Hartley Trust, and there simply is no profit motive involved.
Moreover, the balance of power in Taft-Hartley trusts  with equal representation of the employees and contributing employers  alleviates bias inherent in single employer plans. See, Jones v. Laborers Health and Welfare Fund, 906 F.2d 480, 481 (9th Cir. 1990) ("Because the Board of Trustees consists of both management and union employees, there is no conflict of interest to justify less deferential review."); Cf., Brown v. Blue Cross & Blue Shield of Alabama, 898 F.2d 1556, 1561 (11th Cir.1990) ("Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, it fiduciary role lies in perpetual conflict with its profit-making role as a business."), cert. denied, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). Thus, under the facts of this case, the court finds that the Board of Trustees is not operating under any conflict of interest.
The court having determined that the Board of Trustees is empowered with discretionary authority to interpret the terms of the C-6 Health Benefits Plan, and having further rejected plaintiff's arguments that such authority does not exist, the court must now determine what standard of review other than de novo it is to apply. Firestone, 489 U.S. at 115, 109 S.Ct. at 956-57. Once again, Exbom is controlling.
Where the Trustees are vested with the highest level of discretion, that is where the Trust Agreement's only limitation on the Trustees' discretion is that the Trustees' decisions be made in good faith, the court should review the Trustees' decision under a "standard embodying the highest level of deference. That standard is the arbitrary and capricious standard." Exbom 900 F.2d at 1138.
Under the arbitrary and capricious standard a trustee's decision shall not be overturned on a § 1132(a)(1)(B) matter absent fraud or bad faith if "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." Pokratz v. Jones Dairy Farm, 771 F.2d 206, 209 (7th Cir.1985). "[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents." Shull v. State Machinery Co., *1258 Inc. Employees Profit Sharing Plan, 836 F.2d 306, 308 (7th Cir.1987). The standard has been stated as:
If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.
Exbom, 900 F.2d at 1143 (citations omitted). "In reviewing a fiduciary's decision, `[a] federal court is to focus on the evidence before the truste[e] at the time of [his] final decision an is not to hold a de novo factual hearing ...'" Wolfe v. J.C. Penney Co., 710 F.2d 388, 394 (7th Cir.1983) (quoting Wardle v. Central States, Southeast and Southwest Areas Pension Fund, 627 F.2d 820, 824 (7th Cir.1980)), cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).[2] Finally, the scope of review is necessarily narrow and the reviewing court should not substitute its judgment for that of the fiduciary. Reilly v. Blue Cross and Blue Shield of Wisconsin, 846 F.2d 416, 420 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988).
Under the arbitrary and capricious standard, the court cannot possibly overturn the decision of the Board of Trustees that HDC/PSCR is not uniformly and professionally endorsed by the general medical community as standard medical treatment. They were impartial judges. They had all of the relevant information before them including: the proposed treatment, the substance of correspondence between Central States and Dr. Gibbons, the substance of correspondence with Mrs. Hasty's attorney, a detailed chronology of the medical treatments and events relative to the claim, a summary of prior cases involving HDC including rulings both sustaining and reversing coverage denials, an analysis of the plan, a review of current medical literature on the subject of HDC, medical submissions of the Mrs. Hasty's five (5) oncologists as well as the written opinion of Dr. Herberman, an analysis of the written protocols and informed consent statements relative to the treatment. A review of the administrative minutes of the Board leads the court to conclude that its decision was rationally connected to the issue to be decided and the evidence in the case.
In her briefs, plaintiff recounts much of the evidence presented to the Board of Trustees regarding whether HDC/PSCR in the treatment of breast cancer is uniformly and professionally endorsed by the general medical community as standard medical care and invites this court to re-weigh the evidence and make its own determination. However, under the arbitrary and capricious standard, the standard of review which this court has already held to be applicable to this case, the court refuses plaintiff's invitation. Wolfe v. J.C. Penney Co., 710 F.2d 388, 394 (7th Cir.1983). Even if this court were to reach a different conclusion than the Board of Trustees, it would be improper for it to impose that conclusion under its limited standard of review. Reilly v. Blue Cross and Blue Shield of Wisconsin, 846 F.2d 416, 420 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988).
Plaintiff also asserts that Central States' appeal process is "tainted." In less than clear terms, plaintiff essentially argues that the process does not afford a "full and fair review." Plaintiff's principal argument is that her attorney was not allowed to present her cases before the Board of Trustees, but that defendant's attorney was given such permission to appear before the Board. Plaintiff cites Grossmuller v. International Union, et al., 715 F.2d 853 (3rd Cir.1983), for the proposition that if a fiduciary allows third persons to appear personally, the same privilege must be extended to the participant.
However, no third parties appeared before the Board of Trustees on behalf of defendant. The attorney who did present the agenda concerning Mrs. Hasty's appeal to the Board was William Nellis. Mr. Nellis is an employee of Central States and is also the Secretary for the Board of Trustees.
*1259 Moreover, under the case law, plaintiff was afforded a full and fair review.
Full and fair does not necessarily require a trial like atmosphere complete with attorneys to challenge offered evidence and legally trained hearing officers to rule on evidentiary questions. The decision-maker need not hear oral testimony; a written record will suffice.
Brown v. Retirement Committee of Briggs & Stratton, 797 F.2d 521, 535 (7th Cir.), cert. denied, 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1986). The Grossmuller court concluded:
[T]he persistent core requirements of review intended to be full and fair include knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.
Grossmuller v. International Union, et al., 715 F.2d at 858. These core requirements have been satisfied in this case. Plaintiff had the opportunity to present as much documentary evidence as she wished, and the record indicates that she took full advantage of the opportunity to do so. The record also indicates the Board of Trustees considered the evidence submitted by plaintiff before reaching its decision, and there has been no suggestion that the Board failed to furnish plaintiff with a copy of the minutes of its hearing which listed the evidence relied upon and contained the Board's reasoning for denying the proposed treatment.
Finally, in her Reply Memorandum, plaintiff suggests that the HDC/PSCR treatment can be separated into subparts and the question of coverage considered separately for each subpart. However, plaintiff requested the Board of Trustees to certify that the entire procedure would be covered under the C-6 Health Benefits Plan, not whether the treatment could be parcelled into subparts where some subparts would be covered and others possibly not. The Trustees considered the entire treatment as a whole and determined that the treatment as a whole is not covered under the terms of the Plan.
The court is of the opinion that the treatment should be considered as a whole as there would be no need for the induction, mobilization, leukapheresis or hospitalization stages if it was not for the HDC aspect of the treatment. Indeed, in previous litigation and in the instant case Plaintiff's attorney has made representations that the treatment is to be considered only as a whole and not separated into subparts. See, Wheeler v. Dynamic Engineering, Inc., 850 F.Supp. 459 (E.D.Va.1994) (Court found that HDC/PSCR began with the initial induction phase of treatment, and therefore, insurer could not amend plan after treatment had begun to avoid paying for the treatment).
The court questions whether R.T. Inc., its physicians, plaintiff and plaintiff's attorney belief that HDC/PSCR is an integrated or disjointed procedure depends on medical fact or how best to obtain payment? To adopt different litigation strategies under similar circumstances in different cases on this particular point does not lend credibility to plaintiff's argument in the instant case. The court will not begin its own partitioning of the Plan and the proposed treatment at the stroke of the last bell. The court's limited roll in the instant case is to determine whether the Board of Trustees acted arbitrarily or capriciously when it decided that the entire proposed treatment was not covered by the C-6 Health Benefits Plan.
Unfortunately, this case presents an issue which this court as an institution is ill-equipped to handle. The court must confine itself to the narrow legal question presented and leave public policy and social reform to the other branches of government. Cases of this nature present compelling social questions which go well beyond the limits of this court. Indeed, in two companion cases just recently decided by the Seventh Circuit Court of Appeals,[3] that court quoted at length United States District Judge John D. Tinder's comments concerning difficult claims for medical coverage.

*1260 Despite rumors to the contrary, those who wear judicial robes are human beings, and as persons, are inspired and motivated by compassion as anyone would be. Consequently, we often must remind ourselves that in our official capacities, we have authority only to issue rulings within the narrow parameters of the law and the facts before us. The temptation to go about, doing good where we see fit, and to make things less difficult for those who come before us, regardless of the law, is strong. But the law, without which judges are nothing, abjures such unlicensed formulation of unauthorized social policy by the judiciary. Plaintiff [] well deserves, and in a perfect world would be entitled to, all known medical treatments to control the horrid disease from which she suffers. In ruling as this court must, no personal satisfaction is taken, but that the law was followed. The court will have to live with the haunting thought that [plaintiff], and perhaps others insured by [] similar plans, may not ultimately receive the treatment they need and deserve. Perhaps the question most importantly raised about this case, and similar cases, is who should pay for the hopeful treatments that are being developed in this rapidly developing area of medical science.
Bechtold v. Physicians Health Plan of Northern Indiana, 19 F.3d 322, 324-25 n. 3 (7th Cir.1994); Fuja v. Benefit Trust Life Insurance Company, 18 F.3d 1405, 1407-08 n. 2 (7th Cir.1994) (both quoting Harris v. Mutual of Omaha Cos., 1992 WL 421489 1992 U.S.Dist. Lexis 21393 (S.D.Ind. August 26, 1992), aff'd, 992 F.2d 706 (7th Cir.1993)). The court cannot possibly add anything else to this comment.
Under the arbitrary and capricious standard, the court holds that the Board of Trustees' decision denying coverage for the proposed treatment was reasonably related to the evidence, rationally connected to the C-6 Health Benefit Plan, and therefore, there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law.

CONCLUSION
For all of the foregoing reasons, plaintiff's Motion for Summary Judgment is DENIED, and defendant's Motion for Summary Judgment is GRANTED.
NOTES
[1] The relevant grants of discretionary authority include:

Trust Agreement, Article IV, Section 17:
The Trustees, by majority action, shall have the power to construe the provisions of this Agreement and the terms and regulations of the Health and Welfare Plan; and any construction adopted by the Trustees in good faith shall be binding upon the Union, employees and employers. The Trustees are vested with discretionary and final authority in construing plan documents of the Health and Welfare Fund.
Trust Agreement, Article V, Section 2:
All questions or controversies, of whatsoever character, arising in any manner or between any parties of persons in connection with the Fund or the operation thereof, whether as to any claim for any benefits preferred by any participant, beneficiary or other person, or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or of this instrument, or as to any writing, decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise, shall be submitted to the Trustees, or to a Committee of Trustees and the decision of the Trustees or of such Committee thereof shall be binding upon all persons dealing with the Fund or claiming any benefit thereunder. The Trustees are vested with discretionary and final authority in making all such decisions, including Trustee decisions upon claims for benefits by participants and beneficiaries of the Fund and including Trustee decisions construing plan documents of the Fund.
Plan Document, Section 10.01
The Trustees are vested with discretionary and final authority in making all decisions upon claims for benefits by Covered Participants, Covered Dependents and other claimants, including decisions interpreting plan documents of the Fund.
[2] Plaintiff filed a Motion to Object to Defendant's Reply Brief on May 13, 1994, wherein plaintiff objected to defendant providing the court with attachments that were not presented to the Board of Trustees when they made their decision. The court did not consider the attachments in rendering its decision.
[3] Bechtold v. Physicians Health Plan of Northern Indiana, 19 F.3d 322 (7th Cir.1994); Fuja v. Benefit Trust Life Insurance Company, 18 F.3d 1405 (7th Cir.1994).