O.W. SHULL, Plaintiff–Appellant,

v.

STATE MACHINERY COMPANY, INC. EMPLOYEES PROFIT SHARING PLAN, et al., Defendants–Appellees.

No. 87–1228.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1987.

Decided Dec. 18, 1987.

Jerry Williams, Williams, Taylor & Schmits, Indianapolis, for plaintiff-appellant.

Jim A. O'Neal, Ice, Miller, Donadio & Ryan, Indianapolis, for defendants-appellees.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This suit under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*, charges that the trustees of a profit-sharing plan committed a breach of trust by deducting the principal of a loan that they had made to a participant in the plan from the participant's benefits when they distributed those benefits to him upon his departure from the company. The loan was not yet due; the trustees accelerated the due date of the loan even though the loan agreement contained no provision authorizing them to do that. The participant, O.W. ("Doc") Shull, claims that the trustees acted arbitrarily and capriciously in deducting the loan from his benefits and in refusing to accept substitute collateral. Shull would not accept the benefits minus the deduction, and this gives rise to his further complaint that as custodians of his assets the trustees have invested them imprudently, specifically by placing them in a bank account that does not pay interest. The district court granted summary judgment for the defendants.

Shull was a sales engineer employed by State Machinery Company and a participant in the company's Employees Profit Sharing Plan. He borrowed $50,000 from the plan on December 16, 1983. The loan agreement required him to pay interest semi-annually at an annual interest rate of 11 percent and to repay the principal at the end of five years, or earlier if he wished. The agreement makes no explicit reference to security, but it provides that in the event of a default the amount in default shall be deducted from the benefits that have accrued to Shull under the profit-sharing plan; and the plan itself limits the loan to 50 percent of the participant's accrued benefits or $50,000, whichever is less.

Six weeks after the loan was made to Shull, State Machinery Company fired him because of a dispute, which may have been acrimonious, over the company's transfer of some of his customers to another sales person in anticipation of Shull's planned retirement (he was 55 at the time). Shull's account with the plan showed a balance of $306,000 (we have rounded off all dollar figures to the nearest thousand). The trustees, taking the position that they were entitled to deduct the loan (plus accrued interest) from the account even though repayment was not due for almost five years, sent Shull checks totaling $253,000—which he refused to accept—in payment of the benefits due him under the plan. Shull authorized his attorney to offer substitute security for the loan (a mortgage on his house, a $50,000 certificate of deposit, or marketable securities), but the trustees refused, and he brought this suit for the full balance in his account plus "reasonable" interest.

The "arbitrary and capricious" standard is the canonical standard in this and most other circuits for reviewing actions by ERISA trustees. See, e.g., *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 208–09 (7th Cir.1985); *Adcock v. Firestone Tire & Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987). But there is a growing restiveness in cases where the trustees seem not to be true neutrals in the disputes they are called on to resolve. See, e.g., *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 137–45 (3d Cir.1987). The trustees of State Machinery Company's profit-sharing plan are senior executives of the company. The company fired Shull. From remarks at oral argument we infer that he was an important executive of the company, not just a rank-and-file worker, and that there is bad blood between him and the remaining executives. These two facts cut in different directions, however, so far as the appropriateness of highly deferential judicial review is concerned. If there was bad blood the trustees may not have been impartial, but if Shull was himself an impor-

tant executive he may in some significant sense have consented in advance to having disputes over the profit-sharing plan resolved by his fellow executives, subject to the severely limited judicial review that is traditional in cases involving the denial of employee benefits. He was one of the original participants in the profit-sharing plan (set up in 1963 and amended when ERISA was enacted, to conform to the statute); had he distrusted the other executives he could have pressed for inclusion of an arbitration clause, and then his claim would have been determined by persons not connected with the company.

We need not pursue these byways. The record is silent on the circumstances of Shull's dismissal and on his rank within the company. We have only speculations gleaned from oral argument. For all we know, Shull was just a salesman and there was no rancor in his dismissal. If he wanted to persuade us to review the trustees' action under a higher standard for cases where there is a serious conflict of interest (or some other circumstance that undermines the presumption of impartiality), he had to submit evidence of such circumstances; he did not. If the plan wanted to persuade us to review the trustees' action under a laxer than usual standard, based on Shull's consent to the decision-making arrangements (cf. *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 529 (7th Cir. 1986)), the plan had to submit evidence from which such consent could be inferred; it did not. The state of the record constrains us to review the trustees' action under the arbitrary and capricious standard with no tilt toward either unusually careful or unusually deferential scrutiny.

Under this standard, as applied in ERISA cases, a court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents, in this case primarily the loan agreement itself. See, e.g., *Cook v. Pension Plan*, 801 F.2d 865, 870–71 (6th Cir. 1986); *Jung v. FMC Corp.*, 755 F.2d 708, 713 (9th Cir.1985); *Quinn v. Burlington Northern Inc. Pension Plan*, 664 F.2d 675, 678 (8th Cir.1981). (This is a dramatic departure from the conventional judicial approach to contract disputes, which treats the interpretation of a contract as a matter of law unless extrinsic evidence is introduced. See, e.g., *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198, 1205 (7th Cir.1984).) The trustees found, in effect, that the agreement implicitly provided for acceleration of the loan if the borrower withdrew his benefits under the plan. Equivalently they found that the borrower's accrued benefits were intended to collateralize the loan; if so, withdrawal of the benefits would be a default and make the loan come due. Either way, the trustees' interpretation was reasonable, for the following reasons:

1. The plan provided that if a participant borrowed an amount greater than 50 percent of his vested benefits, the "loan" would be treated as a distribution of benefits—that is, not as a loan at all. This provision gave the plan a ready source of assets on which to draw if the loan went into default, and the loan agreement with Shull expressly provided that in the event of default the plan could reach those assets. The plan's attempt to protect itself from the consequences of making unsecured loans would be defeated if the borrower could withdraw all of his benefits—all of the assets that the plan could look to in the event of default—without having to repay the loan until the due date in the loan agreement.

2. ERISA forbids employee benefit plans to lend to participants unless the loans "are adequately secured." 29 U.S.C. § 1108(b)(1)(E). Since the loan agreement with Shull contained no other provision for security, interpreting it as securing the loan by the participant's vested benefits is necessary to make the loan lawful.

3. The interest rate for loans to plan participants was either two percent below prime or 11 percent, whichever was higher. (The prime rate was 11 percent when Shull borrowed, so that was the rate he paid.) The prime rate is the rate at which a bank makes unsecured loans to its most creditworthy corporate customers. See *Mars Steel Corp. v. Continental Illinois Nat'l*

*Bank & Trust Co.*, 834 F.2d 677, 679, 682 (7th Cir.1987). Individuals usually pay higher rates even when their loans are secured—and still higher rates when their loans are not secured, since the interest rate must be high enough to compensate the lender for the risk of losing the principal of the loan. A loan at or below the prime rate would have been too low for an unsecured loan to an individual who was not required to repay any principal for five years. Sometimes, and here, one can reason backwards from the consideration for a transaction to the terms necessary to make that consideration plausible.

4. Finally, the trustees would have been reckless to endanger the plan assets by making risky loans, although the degree of risk would depend on the ratio of loans to assets and on the diversification of the loan portfolio.

This assemblage of reasons establishes the reasonableness of the trustees' interpretation of the loan agreement, but Shull has another string to his bow. He argues that the trustees acted unreasonably in refusing to accept substitute security. If, as we believe, the trustees acted reasonably in interpreting the loan agreement to contain an implicit acceleration clause, then maybe what Shull is really saying is that the trustees acted unreasonably in refusing to modify the contract. It is an interesting question whether trustees ever have a duty to modify, as distinct from a duty to honor, contracts with plan participants. Cases like *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1353 (D.C.Cir.1982), suggest that trustees lack even the *power* to modify such contracts (notwithstanding their authority to amend the plan, see *International Ass'n of Bridge, Etc., Workers, Local No. 111 v. Douglas*, 646 F.2d 1211, 1214–16 (7th Cir. 1981)) if the modification would hurt other plan participants by making the plan's assets less safe. We need not decide this question. If there is ever a duty to modify a contract with a plan participant it would be activated only in a case of extreme hardship to the participant, which this case is not. If Shull was able to provide adequate security for a $50,000 personal loan for five years, he could have replaced the $50,000 loan from the plan with a $50,000 loan from another lender, albeit at a higher interest rate. His insouciance in refusing for four years now to accept the $253,000 unequivocally owed him by the fund shows that he has no liquidity problems. He could not have been financially embarrassed by the trustees' understandable refusal to accept substitute collateral, which might be costly to monitor and (should there be a default) to collect.

It may be taking too narrow and formalistic a view of the issue, however, to cast it as one of modification. Maybe the proper interpretation of the contract is that it allowed the trustees to treat Shull's accrued benefits as collateral for the loan but did not require them to do so. Then the question would be simply whether they were unreasonable in not allowing him to substitute another form of collateral. They were not unreasonable, since as we have said the substitute collateral might have been more costly to monitor and (if necessary) collect on. And the issue of reasonableness cannot be separated from the issue of hardship. Shull could have used the substitute collateral that the plan turned down to borrow the same amount elsewhere. The trustees were not required to let him remain a borrower at below-market rates from the plan, now that he was no longer a participant; all other considerations aside, such a decision would have harmed the remaining participants.

■ The last question concerns the trustees' management of the $253,000 in Shull's assets during the period since Shull's refusal to accept this money from them. The trustees argue that once he was fired he ceased to be a plan participant and therefore has no rights under ERISA regarding the trustees' management of his —not the plan's—$253,000. The argument is no good in the form in which it is cast, though recast it might have merit. The statute authorizes civil suits by plan participants (among others) to enforce the duties imposed by the statute, 29 U.S.C. § 1132(a), and defines "participant" as including a "former employee ... who is ... eligible to receive a benefit of any type from an em-

ployee benefit plan," 29 U.S.C. § 1002(7). Shull unquestionably is entitled to $253,000 in benefits, but on this branch of the case all he is complaining about is the trustees' management of the fund after they transferred it from the plan's account to Shull's personal account. They *may* have a common law obligation to manage the fund as fiduciaries, though it seems odd to think that Shull could impose involuntary fiduciary duties on them by arbitrarily refusing to accept payment from them; in any event we greatly doubt whether they have an obligation under ERISA. The statute imposes fiduciary duties "with respect to a plan," 29 U.S.C. § 1104(a)(1), and the plan is silent on what happens to benefits after they are distributed to the participant or beneficiary—and maybe Shull's benefits were distributed to him when the trustees sent him valid checks for this amount, which he returned.

We need penetrate no further into this interesting thicket. Shull forfeited any challenge in this court to the management of his $253,000 by failing to raise and press the point in the district court. See *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1393 (7th Cir.1986), and cases cited there. The fact that he made a discovery request for information concerning the trustees' management of his assets did not preserve the issue for review by this court; many leads gathered in discovery are not pursued. The essential point is that the district judge was never asked to decide whether the trustees mismanaged Shull's money after he refused to accept it.

AFFIRMED.