Mahmoud ZIAEE and John L.
Sherlock, Plaintiffs–Appellees,

v.

T. Bruce VEST, et al.,
Defendants–Appellants.

Nos. 89–3621, 89–3699.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided Oct. 19, 1990.

As Amended Oct. 30, 1990.

Rehearing Denied Nov. 21, 1990.

Scott Hendricks, Mark C. Goldenberg, Goldenberg & Hendricks, Granite City, Ill., for plaintiffs-appellees.

Steven H. Akre, David H. Wendt, Clayton, Mo., Richard J. Pautler, Ian P. Cooper, Peper, Martin, Ensen, Maichel & Hetlage, St. Louis, Mo., for defendants-appellants.

Before FLAUM, EASTERBROOK, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Vest Medical Consultants, Ltd., is a small firm of radiologists with two pension plans.

From July 1977 through June 1985 Vest Medical Consultants (VMC) employed Mahmoud Ziaee and John L. Sherlock. Promptly after they left the firm, VMC tendered cashier's checks for their interests in VMC's two pension plans: $96,119 for Ziaee and $94,397 for Sherlock. T. Bruce Vest, the sole stockholder of VMC and administrator of the pension plans, gave Ziaee and Sherlock statements showing how he calculated these sums and a letter informing them that the amounts for Plan 2 would be recalculated by an actuary, with any differences to be remitted later.

Ziaee and Sherlock neither cashed nor returned the checks. In September 1985 Vest sent them the calculations performed by the Massachusetts Mutual Insurance Company, together with checks for an additional $136,716 (Ziaee) and $45,871 (Sherlock) as final payment. This time Vest asked for a release of further claims, including claims to salary or other compensation from VMC. Ziaee and Sherlock did not respond until November, when they offered to accept Vest's original calculations of the benefits under Plan 1 if Vest would accept the computations a second actuary had made under Plan 2 and issue new checks— checks Ziaee and Sherlock thought necessary to avert substantial tax liabilities. (The Internal Revenue Code allows only 60 days to roll over retirement funds into new plans free of tax on the initial distribution, 26 U.S.C. § 402(a)(5); Ziaee and Sherlock thought, whether rightly we need not decide, that new checks would restart the time.) The difference between the two computations for Plan 2 was about $6,817 for Ziaee and $508 for Sherlock. Vest declined unless Ziaee and Sherlock would settle any outstanding dispute about salary. There the matter stood: Ziaee and Sherlock had checks, which they neither cashed nor returned, and VMC was unwilling to pay extra.

This dispute about $7,325 has led to a net judgment of $268,500. After a bench trial in this ERISA suit, the district judge awarded Ziaee and Sherlock benefits exceeding by $22,600 (Ziaee) and $8,500 (Sherlock) the amounts VMC tendered. (We discuss below why these sums exceed the gap between the positions in 1985.) The court tacked on $49,120 in statutory penalties, after concluding that VMC tarried in responding to the plaintiffs' requests for documents, and $125,000 in prejudgment interest. To top things off, the court ordered VMC to pay more than $65,000 in attorney's fees. Defendants' appeal contests every aspect of this award.

## I

■ Relying on *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the district judge construed and applied VMC's pension plan *de novo*. VMC contends that it is entitled to deference because

> Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers.... A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable.

*Firestone*, 489 U.S. at 111, 109 S.Ct. at 954. VMC identifies two sections of the plan document that, it believes, give the trustee the "power to construe disputed or doubtful terms":

> If after review [of a denial of benefits] the [plan's] Administrator concludes that the denial of benefits was erroneous or contrary to this Plan or the law, the Administrator shall take such action as shall be appropriate to provide such benefit.

> The Trustees shall determine, in view of the current circumstances and needs of the Plan, the portion of contributions and funds held under the Plan to be allocated to and invested in the General Investment Account and such Pooled Separate Investment Account pursuant to the terms of the Conversion Account Agreement. Unless the Employer directs otherwise, the Trustees shall have the right and power to invest Plan funds in an Investment Fund to be administered by the Trustees.

The second of these provisions creates discretion over investment strategies but does

not affect the computation of benefits due, given the strategy selected. Ziaee and Sherlock do not contest the plans' investment strategies. The first section decides who within the plans' structure (employer, trustee, administrator) has final authority over benefits. It does not create a "power to construe disputed or doubtful terms"; it does not mention construction.

Cases in this circuit have considered a number of variations on the theme of discretion. We have decided, for example, that a grant of power to "construe and interpret" the plan requires deferential review, see *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990), cf. *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Benefit Trust*, 901 F.2d 1369 (7th Cir.1990), but that a grant of power to make "final and binding" decisions does not imply discretion to construe terms, *Petrilli v. Dreschel*, 910 F.2d 1441 (7th Cir. 1990). See also *Exbom v. Central States Health & Welfare Fund*, 900 F.2d 1138, 1141–42 (7th Cir.1990); *Michael Reese Hospital v. Solo Cup Employee Health Benefit Plan*, 899 F.2d 639 (7th Cir.1990); *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1047–48 (7th Cir.1989). VMC's plans give the Administrator power to decide but do not imply discretion to construe. They are on the *Petrilli* side of the line, and the district judge properly reached his own decision about the plans' meaning.

■ The portion of the plan in dispute provides that VMC "will pay an investment income of 7% on the net balance of the employees contribution for plan # I. Any net loss or change other than the 7% (seven) return on contributions will be retained by the corporation." This is a corporate resolution, not part of the plan documents, but the parties treat it as if it were part of the plan (as shall we, without deciding whether the treatment is appropriate). The district court concluded that this language requires Plan 1 to guarantee the participants a 7% annual return. If the plan's earnings fall short of 7% in any year, VMC must top it up; if earnings exceed 7%, the participants keep the surplus. VMC contends that the resolution does not

create an annual accounting period, so that returns over 7% in some years must be netted against shortfalls in others before determining how much if anything the corporation must add. A third reading is possible: the resolution sets the return at *exactly* 7%, because any "change other than the 7% (seven) return ... will be retained by the corporation". But VMC does not argue for this reading.

If the choice is between an annual accounting period and one measured by the life or employment of the participant, the district judge was entitled to choose the former. It is implied by the 7% figure, which must refer to an annual rate of return. VMC argues that the resolution "makes no express reference to an '*annual*' return on investments" (emphasis in original). True, the reference is not "express", but this is not Argentina. The 7% is not a daily or weekly or monthly rate of return. Returns on pension plans (or other investments) always depend on the choice of accounting period, and the only one implied by this language is the year.

Plan 2 is another matter. The district judge did not identify any error VMC made, equivalent to its omission of the 7% annual minimum for Plan 1. Three computations for Plan 2 were offered into evidence. One was performed by Matt Fischer, the actuary from Massachusetts Mutual. Although VMC hired Fischer, his calculation was independent of any interest Vest had in reducing the payout from his firm's pension fund. Another was performed by Frederick Reed, an expert plaintiffs retained. The third came from Lannert & Wagner (L & W), the firm that drafted VMC's plans. Their calculations were:

| | L & W | Fischer | Reed |
|---|---|---|---|
| Ziaee | $170,843.61 | 164,026.48 | 165,843.46 |
| Sherlock | 59,380.16 | 58,871.89 | 56,962.47 |

Reed admitted that Fischer used an appropriate methodology, and the two came within 1% of agreement. L & W's calculation is higher than both Reed's and Fischer's, in large measure because it computed the value of Ziaee and Sherlock's interests as of September 30, 1985, while Reed and Fischer used June 23, 1985. About half of the difference between the L & W and

Fischer computations may be attributed to the time value of the money in the interim.

Neither Lannert nor Wagner testified. The record contains a one-page letter stating the results of the calculation but not the method. L & W does not explain why its results differ from Reed's and Fischer's by more than the rate of return during the intervening months. The district judge found no flaw in Fischer's calculations. The court's entire explanation for choosing L & W's calculation is: "The Court concludes that [L & W's] calculations ... are the correct figures because [t]his firm ... dealt most extensively with the VMC pension plans and served as plan actuary for a number of years." L & W's experience with VMC's plans may have helped it reach a correct conclusion, but it is not a reason why the particular conclusion it reached is correct, and Fischer's wrong.

■ Despite its name, "de novo" review does not imply that the judge throws the plan's calculations into the trash and makes its own. The court is still "reviewing" the plan's decision, which ought to stand unless mistaken. It may be that even when a court makes a *de novo* decision about the meaning of the plan's terms, review of operational decisions is deferential. We adverted to that possibility in *Petrilli* but did not need to decide; we need not do so here, either, because even the *de novo* standard does not support the district court's decision.

■ "De novo" review means without deference but does not eliminate the need to identify a flaw. A pension plan's decision must stand unless erroneous. Unless there is an error, the plaintiff suffers no legal wrong; without a wrong, there is no justification for a remedy. A federal court is not a forum for a second opinion in every pension case, one the employee may request without challenging the propriety of the plan's decision. The district judge did not find an error in Fischer's method or result; he did not say why Wagner's calculation was more appropriate. Neither plaintiffs nor the district court identifies an error in Fischer's computation, which must

therefore be respected. The judge's award under Plan 2 is reversed.

## II

■ The district court ordered defendants to pay prejudgment interest at the rate of 8.16% from September 30, 1985, on Ziaee and Sherlock's entire entitlement— not just on the amount by which VMC's tender fell short of that entitlement. The result was an award of $125,000. Defendants concede that prejudgment interest is appropriate in ERISA cases, see *Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.*, 896 F.2d 228, 236–37 (7th Cir.1990), but contend that it should not be computed on the entire award.

Prejudgment interest compensates the prevailing party for the loss of use of money during the time between the wrong and the conclusion of the litigation. See *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1297 (7th Cir.1987). By depriving the wrongdoer of earnings on the stake in the interim, the award also creates an incentive to pay promptly. Neither rationale applies when the prevailing party had the money all along. The "wrongdoer" has done what the law demands (turned over the money), and the "victim" has it to invest or spend at discretion. No one could doubt that if VMC had given Ziaee and Sherlock 190,000 silver dollars in July 1985, an award of prejudgment interest on this amount would be inappropriate. It would not make any difference whether Ziaee and Sherlock put the money in a safe deposit box, where it earned nothing, or in certificates of deposit at low interest rates, or in high-yield debt instruments. In any of these cases, Ziaee and Sherlock had the money to invest or stuff in pillowcases as they chose. A court may not compensate them for the unwise use of an option they had.

In July 1985 VMC gave Ziaee and Sherlock cashier's checks totalling more than $190,000. Cashier's checks are the equiva-

lent of cash, *National Diamond Syndicate, Inc. v. United Parcel Service, Inc.,* 897 F.2d 253 (7th Cir.1990). Ziaee and Sherlock did not deposit the checks, an omission that is equivalent to putting silver dollars into a safe deposit box. So far as we know, the pension plans bought the checks with cash, losing the ability to obtain a return from the funds. (A bank could have issued the checks against the plans' note rather than against cash, but there is no evidence that it did so.) Both of the rationales for prejudgment interest therefore are missing: the prevailing parties were not "deprived" of this $190,000, and the losing parties did not have an incentive to string out the case or the ability to earn a return while awaiting its conclusion.

Nonetheless, Ziaee and Sherlock insist, they should be treated as if VMC had never tendered the checks, for two reasons. First, they feared that cashing them would compromise their claims to additional amounts; second, after 60 days, cashing the checks would have exposed them to immediate taxation. Neither is persuasive. If Ziaee and Sherlock had returned the checks, allowing the pension plans to reinvest the money, they might have a decent argument—whether a sufficient one we need not say, for it is not clear that *ex*-employees are entitled to force pension plans to invest disputed sums at the plans' risk for the former employees' benefit. See *Shull v. State Machinery Co. Employees Profit Sharing Plan,* 836 F.2d 306, 309–10 (7th Cir.1987). At all events, Ziaee and Sherlock did not do this. They held onto the checks, and had neither explanation nor excuse for failing to cash them.

Start with the tax argument, a makeweight. Delay was plaintiffs' choice. If delay had adverse tax consequence, that lies on plaintiffs' heads (like using the silver dollars to buy rubies, and burying the rubies) and is no reason to require defendants to pay interest. As for the fear that cashing the checks would extinguish any further claim: Ziaee and Sherlock offer no support for such a belief. VMC did not send a release with the checks in July 1985 and indicated that the sums on Plan 2

would be recomputed by an independent actuary. Cashing the checks without comment created no risk. Accord and satisfaction is a *mutual* decision to resolve accounts. None of the parties believed that the July checks were final settlements. Signing a check that is not tendered on condition compromises nothing. Contrast *Whiting Stoker Co. v. Chicago Stoker Corp.,* 171 F.2d 248 (7th Cir.1948). Ziaee and Sherlock might as well have said that they are numerologists who concluded that the figures on the checks signified some terrible fate and accordingly refused to touch them. Self-induced delusions do not justify prejudgment interest, or any other legal remedy.

■ Defendants do not contend that the checks tendered with releases in September 1985 bar prejudgment interest on these amounts. They submit, however, that the running of interest should have stopped in December 1988, when they deposited these amounts in the registry of the district court, rather than on the date of judgment. Ziaee and Sherlock deposited the checks of July 1985 into the registry at the same time, so it held almost the entire stakes of the case from then on.

We cannot tell the significance of defendants' contention. Registry funds "shall be deposited in an interest-bearing account or invested in an interest-bearing instrument approved by the court." Fed.R.Civ.P. 67. Interest earned on these funds will be credited against the judgment. Despite Rule 67 about 10% of all registry funds throughout the federal courts have been deposited in the Treasury, where they do not earn interest. 1990 Annual Report of the Director, Administrative Office of the United States Courts Table R–1. The parties believe that the registry funds in this case were invested at interest—as all registry funds should be. The court's "approval" is required under Rule 67 only when funds are to be invested in an interest-bearing "instrument"; in all other cases the clerk should put the money in an interest-bearing "account" without ado. We assume that this was done with the money deposited in this case. Unless the district

court's pre-judgment rate of 8.16% exceeds the rate of accrual in the registry, defendants have lost nothing. The record does not reveal the rate at which the registry funds accrued interest. Because there may be a difference, we trudge on.

Do plaintiffs receive prejudgment interest on registry funds? They do, for they lack the use of these funds until the judgment, and defendants get the benefit of the interest earned on these funds. Rates of interest may change when the funds are deposited, however. Interest compensates not only for delay in access to the funds but also for the risk that payment will never come. Risky loans have higher rates of interest. When defendants deposited the money in December 1988, the risk of non-payment fell close to zero. Registry funds are invested in very safe vehicles. The appropriate rate of prejudgment interest for funds on deposit in the registry is the rate those funds earn *in* the registry—the going rate of return compensates the plaintiff for the entire time value of the money at the riskiness involved.

To recapitulate: Ziaee and Sherlock are not entitled to prejudgment interest on the roughly $190,000 VMC tendered in July 1985. They are entitled to prejudgment interest on the rest of their entitlements under the pension plan, but the rate of interest awarded on funds in the registry should equal the rate of return actually obtained on those funds.

### III

ERISA requires pension funds to maintain certain documents and supply them to beneficiaries on demand. An administrator of a plan who delays more than 30 days after receiving a request "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal". 29 U.S.C. § 1132(c). Ziaee and Sherlock contended, and the judge found, that Vest, the administrator of VMC's plans, took more than 30 days to turn over documents Ziaee and Sherlock requested. The court stated that "Vest was delinquent in responding to the various documents demanded by plaintiffs a total of 9,824 document days." It set the penalty at $5 per document day, for a total of $49,120.

■ Vest believes that he supplied documents on time, and that plaintiffs had the documents they maintain he withheld, and that other documents Ziaee and Sherlock wanted are not among those ERISA requires to be furnished. Because, however, the district court did not say which documents were withheld, for which periods, we cannot evaluate this contention. Fed.R. Civ.P. 52(a) requires district courts to enter findings of fact on disputed issues. Although Vest disputed plaintiffs' contentions about the identity of the documents and the time they were furnished, the court made no findings. This is not a flea bite of an issue; $49,120 is real money. Vest was entitled to the findings Rule 52(a) requires, if for no other reason than to permit appellate review. (Findings also assure the parties that the court indeed evaluated their contentions, and the process of writing the findings concentrates the judge's attention, increasing the likelihood of a correct resolution.)

■ We offer comments on two questions that will influence the decision on remand. First, Vest insists that no award is permitted, because Ziaee and Sherlock did not demonstrate injury from the delay. Liquidated damages provisions of the sort in § 1132(c) dispense with proof of injury, however. There is no point in measuring the penalty by the number of days—or in setting a cap on the daily award—if everything reduces in the end to determining the actual loss. The statute commits the size of the penalty to the district judge's discretion; the judge may, but need not, consider the provable injury when exercising that discretion.

■ Second, Vest objects to the imposition of a penalty per document day, as opposed to per day on which any document was undelivered. Section 1132(c) specifies penalties "up to $100 a day", supporting Vest's view that the judge must use calendar rather than document days. Yet the

statute speaks to failure to comply with "a request for any information". This implies that multiple "requests" could support cumulative penalties, even if the delinquencies overlap. A single "request" for 100 documents may allow only $100 per day; on this reading, though, a request each January for the previous year's financial information could start a new $100 daily penalty even though a prior penalty was running because of failure to supply the prior year's report. Unless new requests allow cumulative penalties, there is no marginal deterrent: the plan may well ignore second and subsequent requests.

No case we could find speaks to the question whether penalties for multiple requests may be stacked. It would be premature to answer the question, which so far appears to be abstract. We do not know how many "requests" Ziaee and Sherlock made, or what the maximum penalty for any one day comes to under the district court's approach. Unless more than 20 documents were tardy on at least one day, then every day's penalty is at or under $100. A judge may consider the number of requests made and the number of documents withheld when exercising discretion within the range 1¢ to $100 per day, even if the sanction may not exceed $100 per day. In setting a new penalty, the judge should either convert to a daily amount or determine whether more than 20 documents were tardy on any day and explain why $5 is the right sanction per "document day".

Attorneys' fees are the final issue separating the parties. Because we have reversed the entire award under Plan 2, set aside much of the prejudgment interest, and directed the reconsideration of the penalty, it is also necessary to vacate the award of attorneys' fees. A fresh award should be made, if the judge believes that one remains appropriate, after the proceedings we have required.

The judgment is reversed in part and vacated in part. The case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall not apply on remand.