**Merlyn G. BRUNS, Plaintiff,**

v.

**NORTHWESTERN STEEL & WIRE COMPANY, Pension Plan B for Salaried Employees of Northwestern Steel & Wire Company, John Meyer, Ed Maris, James Boesen, Jeff Hager, Alex Rios, Ruben Moreno, individually and as members of the General Pension Board of Northwestern Steel & Wire Company, Defendants.**

No. 93 C 20196.

United States District Court,
N.D. Illinois,
Western Division.

Nov. 21, 1994.

A. Lou Benassi, Benassi & Benassi, P.C., Peoria, Alex M. Abate, Rockford, IL, for plaintiff.

Harry M. Sangerman, McDermott, Will & Emery, Chicago, IL, for defendants.

REINHARD, District Judge.

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Merlyn G. Bruns brought this action to recover pension benefits under section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1132(a), against defendants Northwestern Steel & Wire Company, Pension Plan B for Salaried Employees of Northwestern Steel & Wire

Company, and Northwestern Steel & Wire General Pension Board (the "Pension Board") members John Meyer, Ed Maris, James Boesen, Jeff Hager, Alex Rios, and Ruben Moreno. Both Bruns and defendants have moved for summary judgment. Bruns has also moved to strike certain affidavits presented by defendants in regard to the motions for summary judgment.

## BACKGROUND

In deciding cross-motions for summary judgment, a court must use care, as each party in opposing the other party's motion is in turn entitled to have the court draw all reasonable inferences and take the facts in its favor. In the present case, however, the parties' dispute is not over the facts. Bruns was first employed by Northwestern Steel & Wire Company ("Northwestern") on May 6, 1964. After working in various positions in the bargaining unit, he was promoted in 1969 into Northwestern's labor relations department. After two years there as supervisor of contract administration, he was promoted to the position of manager of labor relations. In 1984, he was again promoted, this time becoming director of human resources. Eventually, in 1991, Bruns was given the title of vice president of human resources. Bruns remained in this vice president position until his termination in February of 1992. On August 16, 1988, Bruns entered into a three-year employment agreement with Northwestern, which eventually was extended an additional year, to August 16, 1992. According to Bruns, his goal was to retire after thirty years employment with Northwestern, qualifying for a "thirty-and-out" pension.

Northwestern terminated Bruns on February 13, 1992, after twenty-seven years service with the company. Based on his years of service, Bruns was eligible for a deferred vested pension under Pension Plan B for Salaried Employees of Northwestern Steel & Wire (the "plan"). Shortly prior to Bruns' termination, Pension Board member Boesen advised Bruns that if he were disabled, he would qualify for a "70/80 pension" under section 2.6 of Pension Plan B, which provides a pension for employees with certain combi-

nations of age and years of service who have been terminated because of disability.

On June 10, 1992, Bruns entered into an employment termination agreement acknowledging his termination date as February 13, 1992. Paragraph 1 of the agreement stated that Bruns was terminated "other than for Cause or Disability." Paragraph 5 of the agreement contained a general release of Northwestern from liability, with the proviso that Bruns remained "entitled to receive whatever benefits he may have accrued under the Company's Pension Plan B and 401(k) Savings Plan for Salaried Employees in accordance with the terms and provisions of such plans."

In the mid–1970s, Bruns' internist, Dr. Thomas Flynn, had diagnosed Bruns as having rheumatoid arthritis and referred him to the Mayo clinic. Dr. Flynn was Bruns' treating physician for this condition until 1986, when he referred Bruns to Dr. Frederick Dietz, a specialist in the disease, who became Bruns' treating physician for the disease. According to Dietz, while rheumatoid arthritis is a progressive disease with no known cure, medication and other treatments had stabilized the symptoms of Bruns' condition between 1986 and 1991, albeit with periods of improvement and regression. At one point Bruns' symptoms improved to the point he could go horseback riding, while at another point, in mid–1990, the arthritis flared up, requiring an adjustment of his medication.

The last time Dietz treated Bruns prior to his termination was July of 1991. At that time, Dietz observed that Bruns had stabilized. When Bruns visited Dietz on February 24, 1992, after his termination, however, the physician believed Bruns incapable of working in any capacity. Dietz suggested to Bruns that he file for disability and noted that Bruns should have no trouble qualifying for it. When Bruns visited Flynn on March 24, 1992, Flynn also was of the medical opinion that Bruns was totally and permanently disabled.

On September 21, 1992, Bruns orally applied for a permanent incapacity pension

("PIP") under section 2.5 of the plan.[1] The Pension Board then directed him to apply in writing, which he did on October 1, 1992, supplementing his application on November 20, 1992. In a January 6, 1993 letter from John C. Meyer, Northwestern's vice president of human resources, the Pension Board notified Bruns of its decision to deny him a PIP. That letter states the reason for denial as:

Paragraph 2.5 of the Pension Plan provides that a participant may retire from the employ of the Company on Permanent Incapacity Retirement only (i) if he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any employment of a type performed at the Company, and (ii) after such total disability shall have continued for a period of five consecutive months and, in the opinion of a qualified physician, such total disability will be permanent and continuous during the remainder of his life.

The Board concluded that your termination of employment in February, 1992 was not because of disability and that you had not been totally disabled (so as to be unable to work for the company) for a period of five consecutive months prior to the time your employment terminated, as required by Paragraph 2.5, since you were actively employed until February. The Board's decision is based upon the requirements of Paragraph 2.5 after giving consideration to your November 20, 1992 Statement of Facts, supporting documents you furnished in connection with your application for 70/80 Disability Pension, and your Employment Termination Agreement dated June 10, 1992. Accordingly, the Board has disapproved your October 1, 1992 application for Permanent Incapacity Retirement.

On January 8, 1993, Bruns requested an appeal of the Pension Board's decision. In response, the Pension Board requested that Bruns submit specific issues and comments to be considered on appeal, which Bruns' attorney then provided. Bruns' primary con-

tention was that "participant" under the Plan included in this context a retiree, and therefore the Plan permitted a person who becomes disabled after retiring to then qualify for a PIP. Adopting the recommendation of its attorney, the Pension Board implicitly rejected this argument, instead interpreting section 2.5 of the plan to require a participant to have been eligible for a benefit on the last day of service to qualify for it. Because Bruns had not been disabled for five consecutive months prior to retiring, the Pension Board denied Bruns' appeal on April 26, 1993. On June 15, 1993, the pension Board notified Bruns that he had exhausted all administrative steps under the plan.

The plan contains the following relevant provisions:

1.1 *Definitions*

Whenever used in this Pension Plan:

. . . .

(h) The term "participant" means any Employee who shall have had at least 1 year of continuous service and shall have attained the age of 25 years and who, from time to time during the period in which this Plan is effective, is accruing continuous service; where so indicated in the context, "participant" also refers to a person who is no longer accruing continuous service but who had attained pension eligibility under this Plan at the date he ceased to accrue continuous service, including a person who is retired and is receiving or is entitled to receive pension benefits under this Plan.

1.2 *When Retirement Occurs*

For purposes of this Plan, retirement shall be considered to occur:

. . . .

(b) in the case of a participant who applies for a pension after a break in continuous service, on the last day of his continuous service, provided that on such last day he was eligible for an immediate or deferred pension under this Plan.

2.5 *Permanent Incapacity Retirement*

---

1. Bruns oral application for a PIP occurred during the hearing on his appeal of the Pension Board's denial of a 70/80 pension under section

2.6 of the plan. The Pension Board's decision on the 70/80 pension is not raised in the present case.

Any participant who shall have had at least 15 years of continuous service and who shall have become permanently incapacitated shall be eligible to retire on or after July 31, 1980 and shall upon his retirement (hereinafter "permanent incapacity retirement") be eligible for a pension. A participant shall be considered to be permanently incapacitated (as "permanently incapacitated" is used herein) only (a) if he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any employment of a type performed at the Company, and (b) after such total disability shall have continued for a period of five consecutive months and, in the opinion of a qualified physician, it will be permanent and continuous during the remainder of his life. Incapacity … resulting from future service in the armed forces and which prevents him from returning to employment with the Employing Company and for which he receives a military pension, shall not entitle a participant to a pension under this paragraph 2.5. Such pension shall be discontinued if such participant shall cease to be permanently incapacitated prior to age 62. The permanency of incapacity may be verified by medical examination prior to age 62 at any reasonable time.

As to the role of the Pension Board, the plan provides in section 8.2(a) that it has the power and duty "[t]o grant such pensions or other benefits as are provided under this Plan." In addition, section 8.2(b) grants the Pension Board the power and duty "to decide such questions as may arise in connection with the operation of this Plan."

## CONTENTIONS

In moving for summary judgment, defendants contend that the court should review the Pension Board's decision not *de novo* but only for whether it is arbitrary and capricious. The basis of this contention is defendants' assertion that section 8.2 of the plan grants the Pension Board discretion to determine pension eligibility. Defendants further contend that regardless of the standard of review, the Pension Board properly interpreted the plan. Defendants' also contend

that under the employment termination agreement entered into by Bruns and Northwestern on June 10, 1992, Bruns released his right to a PIP. Finally, defendants contend that because the Pension Board's decision focused on formal eligibility requirements for a PIP and not on the medical evidence of disability, if the Pension Board's decision is reversed by this court, the court should remand to the Pension Board for consideration of the latter.

In opposing defendants' motion for summary judgment, Bruns contends the language of section 2.5 of the plan unambiguously grants him a PIP. Bruns further contends that any interpretation of section 2.5 denying him a PIP would be inconsistent with other provisions of the plan. Bruns also contends that the Pension Board's interpretation of the plan is contrary to the statutorily-mandated summary plan description. Bruns additionally contends that even if the plan is ambiguous, such ambiguities should be construed in his favor. Bruns further contends that the employment agreement did not terminate Bruns' right to a PIP, as both ERISA and the plan prohibit alienation of plan benefits. Bruns also contends the plan did not give the Pension Board discretion to interpret plan terms. Bruns additionally contends that defendants are estopped from denying him benefits. Finally, Bruns contends remand is not the appropriate remedy if the Pension Board's decision is reversed.

In support of his own motion for summary judgment, Bruns contends the proper standard of review is *de novo* and that Bruns qualifies for a PIP under the proper interpretation of the plan. Bruns further contends that the Pension Board did not employ adequate procedures in denying Bruns' PIP claim.

In moving to strike expert opinion affidavits submitted by defendants, Bruns contends that regardless of whether review of the Pension Board's decision is *de novo* or under the arbitrary and capricious standard, this court is limited in its review to the facts and reasons before the Pension Board at the time it made its decision. *See Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (in conducting *de novo* review, court

should not consider extrinsic evidence to determine whether plan is subject to multiple reasonable interpretations); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 696 (7th Cir. 1992) (in conducting deferential review, court should not accept *post hoc* rationale for decision).

In opposing the motion to strike, defendants contend that expert opinion testimony is admissible in reference to construction of a document in order to demonstrate the underlying custom and usage of terms in an industry. Defendants further contend that the cases cited by Bruns prohibit admission of evidence not considered by the plan administrator in making factual determinations, as opposed to evidence here which is proposed to be used in construing plan terms.

### DISCUSSION

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *International Union of United Auto., Aerospace and Agric. Implement Workers v. Randall Div. of Textron, Inc.*, 5 F.3d 224, 228 (7th Cir.1993). The inquiry to be made on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). In weighing a motion for summary judgment, the court must take the facts in the light most favorable to the party opposing the motion and draw all reasonable inferences in that party's favor. *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994).

### I. Standard of Review of Pension Board Decision

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that due to the purposes of ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans," 489 U.S. at 113, 109 S.Ct. at 956 (quoting *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)), and "to protect contractually defined benefits," *id.* (quoting *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)), courts should generally review benefit eligibility determinations *de novo,* a standard which the Supreme Court imported from trust law, *see id.* 489 U.S. at 108–15, 109 S.Ct. at 953–57. The exception to this general rule occurs when the document creating the ERISA plan entrusts the decision-maker with discretion. *Id.* at 110–12, 109 S.Ct. at 954–55. In that case, an eligibility determination will be overturned only if it is arbitrary and capricious. *Id.* In other words, where a plan gives a pension board "power to construe disputed or doubtful terms," its "interpretation will not be disturbed if reasonable." *Id.* at 111, 109 S.Ct. at 954.

Accordingly, the threshold issue in the present case is whether the plan grants discretion, the power to construe disputed or doubtful terms, to the Pension Board. Defendants point to two plan sections which they contend grant such discretion. Section 8.2(a) of the plan provides that the Pension Board has the power and duty, "To grant such pensions or other benefits as are provided under this Plan." Section 8.2(b) provides the Pension Board with the power and duty, "To make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of this Plan, and to decide such questions as may arise in connection with operation of this Plan."

A plan need not use any magic words to indicate delegation of the power to construe, *see Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 378–80 (7th Cir.1994), but it must give at least some indication that this is what is intended, *see Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (rejecting arbitrary and capricious re-

view because plan did not *"expressly* give the administrator discretion to construe the terms of the Plan or make determinations as to eligibility." (emphasis added)). A grant of power to make final and binding decisions, such as that found in section 8.2(a), does not, without more, imply that power to construe plan terms was also granted. *See Petrilli v. Drechsel,* 910 F.2d 1441, 1447 (7th Cir.1990). On the other hand, the power "to decide such questions as may arise in connection with operation of this Plan" granted in section 8.2(b) might at first glance appear to resemble language which has been found by the Seventh Circuit to grant discretion. *See Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685, 688 (7th Cir.1992) (plan stating administrator "shall determine all questions arising in the administration, interpretation and operation of the Plan" held to grant discretion); *Allison v. Dugan,* 951 F.2d 828, 832–33 (7th Cir.1992) (language granting authority "to determine all questions arising in the administration, interpretation and application of the pension plan, including questions of eligibility," when coupled with language granting power "to decide all questions or controversies arising in any manner or between any parties or persons in connection with the trust fund or the operation thereof, whether as to any claim for benefits ... or whether as to the construction of the language or meaning of the rules and regulations ... established" by the plan, created discretion); *Foster McGaw Hosp. of Loyola Univ. v. Building Material Chauffeurs, Teamsters & Helpers Welfare Fund,* 925 F.2d 1023, 1026 (7th Cir.) (plan giving trustees authority to "determine all questions arising in the administration, interpretation and application" of the plan, "including questions of eligibility" held to grant discretion), *cert. denied,* —— U.S. ——, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991); *Saracco v. Local Union 786 Pension Fund,* 942 F.2d 1213, 1215 (7th Cir.1991) (identical plan language as *Foster McGaw* held to grant discretion).

When actually compared with these grants of discretion, however, the language of section 8.2(b) turns out to be considerably abbreviated, and the omissions are significant. Section 8.2(b) does not refer to the power to "determine" or to "construe," but simply to

the power to "decide." It does not connect that reference to benefit eligibility decisions. In fact, it refers only to questions arising in connection with "operation" of the plan, not to "interpretation" or "application" of the plan itself. In short, section 8.2(b) is nothing more than a grant of power to make final and binding decisions, which, as has already been recognized with respect to section 8.2(a), does not, without more, imply that authority to construe plan terms was also granted. *See Petrilli,* 910 F.2d at 1447. The Seventh Circuit has been quite clear that the "power to decide" does not necessarily imply the "discretion to construe." *See Ziaee v. Vest,* 916 F.2d 1204, 1207 (7th Cir.1990). As a result, the Pension Board's denial of benefits according to the plan here must be reviewed *de novo.*

## II. Denial of Benefits Under Section 2.5

The Pension Board's letter to Bruns denying him a PIP stated that its decision was "based upon the requirements of Paragraph 2.5" in light of the factual materials before the Pension Board. According to the letter,

> The Board concluded that your termination of employment in February, 1992 was not because of disability and that you had not been totally disabled (so as to be unable to work for the company) for a period of five consecutive months prior to the time your employment was terminated, as required by paragraph 2.5, since you were actively employed until February.

The letter thus focused on the requirement, found in the second sentence of section 2.5, that in order to be permanently incapacitated the "total disability shall have continued for a period of five consecutive months." The Pension Board read this requirement in conjunction with the first sentence of the section, which requires permanent incapacity prior to retirement. Because Bruns had been actively employed up until his termination in February of 1992 and was not terminated for disability, he had not been totally disabled for five months prior to the break in continuous service which constituted his retirement. As a result, the Pension

Board found, Bruns was not eligible for a PIP.

Reading the first two sentences of section 2.5 together to require five consecutive months of total disability before an employee's retirement in order to qualify for a PIP makes sense. The second sentence of section 2.5 defines permanent incapacity ("A participant shall be considered to be permanently incapacitated ..."), in conjunction with other requirements, as occurring only if total disability has "continued for a period of five consecutive months." The first sentence of section 2.5 refers to the retirement of a participant who "shall have become permanently incapacitated," indicating that permanent incapacity, as defined in the second sentence, must precede retirement. In the same vein, the first sentence states that a participant with a permanent incapacity "shall be eligible to retire" after a certain date and, most importantly, states that he "shall *upon his retirement* ... be eligible for a [PIP] pension" (emphasis added). Thus, the plain meaning of this sentence is that permanent incapacity, as it then is defined in the second sentence to have endured for five consecutive months, must occur before retirement.[2]

This reading of the plan finds corroboration in the summary plan description, which states that

A PARTICIPANT WHO HAS AT LEAST 15 YEARS OF CONTINUOUS SERVICE AND WHO HAS BECOME PERMANENTLY AND TOTALLY INCAPACITATED AND HAS BEEN SO INCAPACITATED FOR AT LEAST FIVE CONSECUTIVE MONTHS *may retire* before age 65 and receive a Regular Pension, so long as he remains totally incapacitated.

(emphasis added). In stating that a participant who meets certain conditions and "has been so incapacitated for at least five consecutive months may retire" and qualify for a PIP, the summary plan description incorporates the same basic assumptions as the plan itself: 1) that permanent incapacity must precede retirement and 2) that permanent incapacity is defined as having been incapacitated for five consecutive months. By doing so with different wording and syntax, it demonstrates that this clear implication found in the plain language of section 2.5 was not an accident or mistake of drafting, but was, in fact, built into PIP eligibility.

 Further, implicit in and necessary to such a reading and to the Pension Board's decision is defining retirement as the last day of continuous service, i.e., the day after which Bruns (in the words used in the Pension Board's January 6 letter denying benefits) was no longer "actively employed" with Northwestern.[3] Such an approach is sup-

---

2. The court thus need not resolve the arguments raised by defendants based upon the termination agreement entered into by Bruns and Northwestern (i.e., whether such an agreement entered into by an employee and employer is binding with reference to the Pension Board, whether the ERISA alienation of benefits prohibition (and a parallel one in the plan) extended to such an agreement, and whether this particular agreement did, in fact, cede Bruns' rights to a PIP).

3. Bruns refers in his brief to a cursory and undeveloped theory that estoppel principles should prevent the Pension Board from denying him a PIP. Bruns contends that he signed the termination agreement under the understanding that neither its language nor the effective date of his termination would affect his eligibility for a PIP. To the extent it exists in the ERISA context, estoppel arises "when one party has made a misleading misrepresentation to another and the other has reasonably relied to his detriment on that misrepresentation." *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 648 (7th Cir.1993) (quoting *Black v. TIC Investment Corp.,* 900 F.2d 112, 115

(7th Cir.1990)). As discussed in note 2, *supra*, the termination agreement was not involved in the denial decision and has not been relied upon in this court's affirmance of that decision. As to whether the effective date of his termination should give rise to estoppel, Bruns has simply not developed and supported what the misrepresentation was and how he reasonably relied upon it to his detriment. As discussed in note 4, *infra*, the termination agreement set a purely technical "termination date" which did not change the date on which his break in continuous service and, thus, retirement, occurred for purposes of determining PIP eligibility. The starting point of this case was that Bruns did not voluntarily retire from Northwestern, but was terminated, and thus had no control over the precise date his break in continuous service occurred. The crucial point for pension eligibility determination is the date on which his break in continuous service occurred, a date chosen by Northwestern. None of the documents, affidavits, and depositions submitted in regard to the motions for summary contradicts the latter fact. In this light, without more from Bruns, not even a genu-

ported by section 1.2(b) of the plan, which, for relevant purposes, does in fact define retirement as having occurred on the last day of continuous service.[4] This is corroborated by the summary plan description, which states that "[a] participant who applies for a pension after a break in continuous service is considered to have retired on the last day of continuous service." Corroboration is also found in section 1.1(h), which allows a retiree to be a participant if he "had attained pension eligibility under this Plan at the date he ceased to accrue continuous service."

An additional implicit and necessary element of the Pension Board's decision was a rejection of Bruns' primary contention: that "participant" included a retiree and that section 2.5, which confers a PIP on "[a]ny participant" who otherwise meets its requirements, thus granted a PIP to Bruns. The actual definition of "participant" in section 1.1(h) first refers to employees accruing continuous service and then goes on to state that,

> where so indicated in context, 'participant' also refers to a person who is no longer

accruing continuous service but who had attained pension eligibility under this Plan at the date he ceased to accrue continuous service, including a person who is retired and receiving or is entitled to receive pension benefits under this Plan.

At the very least, such a definition throws the question back to section 2.5, requiring a determination of whether the latter section is a context indicating inclusion of persons who are not employees accruing continuous service, such as Bruns. As discussed above, section 2.5 only refers to participants who shall be retiring, not those who have already retired. Indeed, section 1.1(h) can even be read as requiring pension eligibility in order for a retiree to qualify as a participant—which would once again throw the question back to section 2.5 for a determination of eligibility. In fact, section 1.1(h)'s limitation of participant status to a retiree "who had attained pension eligibility under this Plan at the date he ceased to accrue continuous service" is nearly a restatement of the first sentence of section 2.5. As a consequence, the Pension Board properly rejected Bruns' primary argument.[5]

---

ine issue of material fact has been raised in regard to promissory estoppel. As the Seventh Circuit recently stated, "A promise ... does not by itself a promissory estoppel make. The promisee must rely to his detriment, and his reliance must be reasonable (another reason why a person made ineligible by ERISA to participate in an ERISA plan could not invoke promissory estoppel to shoehorn his way into one)." *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 759 (7th Cir.1994). In addition, the promise supporting estoppel which makes a participant of someone who otherwise would not be a participant may have to be in writing, *see id.* at 758–59, which was not the case here.

4. Bruns argues that because the termination agreement he signed with Northwestern designated a "termination date" of August 16, 1992, at which time his wages and benefits would be discontinued, the proper date for determining PIP eligibility was that date, not February 13, 1992, meaning that he may have satisfied the five consecutive month period of total disability prior to retirement required by section 2.5. As Bruns admits in making this argument, however, "the 'termination' date was a technical term under ... Bruns' Employment Agreement." In making its decision, the Pension Board instead relied upon the date on which Bruns was actually terminated and stopped working for purposes of determining the break in continuous service un-

der section 1.1(h) and, thus, retirement under section 2.5, which is in line with the ordinary meaning of those terms.

5. In Count II of the complaint, Bruns asserts that the Pension Board's letter explaining its denial of Bruns' application for a PIP was inadequate, citing the requirement under ERISA that notification of a denial "set[ ] forth specific reasons for such denial," 29 U.S.C. § 1133(1), the parallel requirement found in the implementing regulations, 29 C.F.R. § 2560.503–1(f)(1), and *Halpin's* finding that a pension board had not satisfied that requirement, 962 F.2d at 691. Bruns argues that because the Pension Board's January 6, 1993 letter simply states that to be eligible for a PIP an employee must be disabled for five consecutive months prior to retirement and identifies § 2.5 as the source of this requirement, without actually quoting the language containing the requirement, it has not satisfied the specificity requirement of ERISA. The January 6 letter, however, contained a paragraph outlining § 2.5 preceding the one in which it gave the reasons for its decision. It then explained the reasons for its denial of benefits. *The interpretation of the plan relied upon is readily apparent from the January 6 letter.* While the explanation did not rise to the prolixity of a judicial opinion, it readily provided Bruns with the reasoning behind the Pension Board's decision. As the arguments in

Bruns places heavy emphasis on the Fourth Circuit's interpretation in *Parsons v. West Virginia Works Hourly Employees Pension Plan*, 879 F.2d 130 (4th Cir.1989) (per curiam), of a plan containing provisions nearly identical to § 2.5 and § 1.1. This court finds the reasoning of *Parsons* unpersuasive in light of the logical structure of the first and second sentences of section 2.5 and the corroboration found in the summary plan description. The Fourth Circuit in *Parsons* relied upon the stipulation to the district court that the employees would be eligible for a pension at retirement age, meaning that they had attained pension eligibility on the date they ceased to accrue continuous service. 879 F.2d at 131. Reliance on such a stipulation, however, conflates permanent incapacity pension eligibility under section 2.5 with other types of pension eligibility, such as normal retirement under section 2.1. For purposes of PIP eligibility under section 2.5, the fact that a retiree has obtained eligibility under another section is not determinative.

Bruns asserts the *Parsons* court's theory that the inclusion in section 2.5 of a single, limited exception to PIP eligibility on the basis of incapacity incurred while not employed with the employer indicated that other, post-employment incapacity was not excluded from PIP eligibility. *See* 879 F.2d at 132. Bruns' argument is based upon the sentence in section 2.5 stating that

> Incapacity contracted, suffered or incurred while the participant was engaged in, or resulting from his having engaged in, a criminal enterprise, or resulting from future service in the armed forces and which prevents him from returning to employment with an Employing Company and for which he receives a military pension, shall not entitle a participant to a pension under this paragraph 2.5.

This sentence thus addresses the particular circumstances of the employee who interrupts his employment for service in the armed forces and is then incapacitated and receives a military pension.

One line of argument based upon this passage is that because the sentence explicitly

excludes from coverage the employee whose "break in service" occurs before the incapacity, it must have intended coverage in all other cases of break in service before incapacity. *See Parsons*, 879 F.2d at 132. Not only does such a construction of section 2.5 fly in the face of the plain meaning of its first sentence, but it ignores the Veterans Reemployment Rights Act, which requires that an employer treat an employee who interrupts his employment for service in the armed forces as having been on leave for purposes of employee benefits. *See* 38 U.S.C. § 4301(b)(1)(A) (1994). In other words, by law the break in service cannot have occurred until after the return from military duty.

Another argument based on this passage is that the expression of this single exception from coverage means that there are no other exceptions. Such an implication may very well be true with regard to "exceptions," but to hold that it makes Bruns eligible for a PIP would be to mischaracterize the effect of the first two sentences of section 2.5. That an employee must be permanently incapacitated before retirement in order to qualify for a PIP is not an "exception" to PIP coverage; it is, instead, a basic requirement of PIP eligibility. That an employee must be disabled for five consecutive months in order to be permanently incapacitated is not an "exception" either; it is an essential element of the definition of permanent incapacity. Therefore, the expression of an exception, the military service exclusion, does not create the negative implication that all other incapacities occurring after the break in service must be covered. In any event, even if the military service exclusion were somehow to lend some support to the reading of section 2.5 that Bruns urges, it would not be enough to overcome, or even create an ambiguity with regard to, the plain meaning of the first two sentences of section 2.5.

Bruns makes a similar argument based upon section 2.6. That section not only states that an employee who otherwise qualifies "shall upon his retirement ... be eligible for a pension" but also states that it applies,

---

Bruns' briefs on the present motions demonstrate, *see* "Contentions", *supra*, the Pension

Board's denial letter could hardly be said to have left Bruns without meaningful review.

 

*inter alia,* to an employee "whose continuous service is broken ... by reason of physical disability." Bruns seizes upon this latter statement to argue that if permanent incapacity prior to retirement were intended to have been required in section 2.5, it would contain similar language. Such an argument ignores the different roles of the two sections. Section 2.6 is evidently intended to provide a pension to an employee whose break in continuous service is *caused by* his disability. As Bruns implicitly obviously recognized in applying for a PIP after having been denied a 70/80 pension under section 2.6 (disability not having been the basis of his termination), a PIP is intended for the employee who is permanently incapacitated prior to retirement, regardless of the reason for retirement. In other words, the "continuous service is broken ... by reason of physical disability" language in section 2.6 is found there and not in section 2.5 because it incorporates a salient difference between the two sections.

The final element of the Pension Board's decision was its finding that because Bruns was actively working at the time he was terminated and was not terminated for disability, he was not totally disabled at the time he retired. While Bruns has presented evidence that two physicians found him disabled after his termination, he has presented no evidence, medical or otherwise, to the effect that he was incapacitated (despite the fact that he worked) at any time prior to termination, let alone incapacitated for five consecutive months prior to that date. Therefore, regardless of whether such a factual determination is subject to deferential or *de novo* review, *see Donato,* 19 F.3d at 379 n. 2, or whether the basis for review is limited to those facts before the board at the time it made its decision, *see Halpin v. W.W. Grainger, Inc.,* 962 F.2d at 696; *Hickey,* 995 F.2d at 1389, Bruns has not raised a genuine issue of material fact that he had been permanently disabled for five consecutive months prior to termination.

6. Because the court finds the Pension Board to have correctly denied Bruns a PIP based upon the plain language of the plan itself and, therefore, grants defendants' motion for summary judgment and denies plaintiff's motion for sum-

Thus, the Pension Board correctly read the plan to require five continuous months of total disability prior to the break in continuous service to be eligible for a PIP, and it properly found that Bruns had not met that requirement.[6]

## CONCLUSION

For the reasons stated above, Bruns has not raised a genuine issue of material fact and defendant is entitled to summary judgment as a matter of law. Defendants' motion for summary judgment is granted, and Bruns motion for summary judgment is denied. Bruns' motion to strike is denied as moot. The case is dismissed.

mary judgment without in any way consulting or relying upon the expert opinion affidavits submitted by defendants, plaintiff's motion to strike is denied as moot.